```
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
```
_____

In re:

CINOLE, INC.,                           CASE NO. 05-25705

                    Debtor.             DECISION & ORDER
_____

## BACKGROUND

On October 6, 2005, Cinole, Inc. (the "Debtor") filed a petition initiating a Chapter 11 case. At the time of the filing of its petition, the Debtor alleged that it was the owner of forty-two (42) parcels of real property located in the City of Rochester, Monroe County, New York. The Debtor filed its Chapter 11 petition on October 6, 2005 in order to stop the City of Rochester (the "City") from completing its In Rem real estate tax foreclosure sale (the "Tax Sale") of forty-one (41) of these properties scheduled for October 7, 2005.

The sole shareholder of the Debtor is Daniel J. Wik ("Wik"). Wik filed a Chapter 13 case in this Court on December 12, 2001 that was dismissed on January 28, 2002 for failure to file Schedules and a Plan. Wik filed a second Chapter 13 case on April 15, 2002 (Daniel J. Wik f/d/b/a the White Thumb Bakery Café, f/d/b/a Shannons Frozen Custard and Yogart, Case No. 02-21412), which case was pending on October 6, 2005. In the pending case, where there has been a series of Dismissal and Stay Termination Motions, Wik

scheduled his ownership of the following parcels of real property: 15-23 Anderson Avenue, Rochester, New York, 25-31 Anderson Avenue, Rochester, New York (vacant land), 366 Alexander Street, Rochester, New York, 653 Averill Street, Rochester, New York, and 795 Niagara Street, Buffalo, New York (vacant lot).

On October 7, 2005, one of the attorneys for the City (the "City Attorney") requested an emergency Section 362 telephonic conference with the Court and the attorney for the Debtor. The Court conducted the telephonic conference at approximately 1:15 p.m. when the attorney for the Debtor was finally available.

During that telephonic conference, the City Attorney advised the Court that: (1) the City was in the process of completing the Tax Sale for forty-one (41) of the forty-two (42) properties, which the Debtor alleged it owned, as listed on an October 6, 2005 letter the City received that day from the attorney for the Debtor; (2) on the morning of October 7, 2005, the attorney for the Debtor delivered copies of Quit Claim Deeds to the City, which indicated that the majority of the properties in question had been deeded to the Debtor on either October 5, 2005 or October 6, 2005; (3) except for a few of the properties in question, the City could not locate any Quit Claim or other deeds of the properties to the Debtor that had been recorded in the Monroe County Clerk's Office; (4) the City believed that the Debtor's Chapter 11 petition was a bad faith

**Page 2**

filing, filed for the sole purpose of stopping the City from completing the Tax Sale; (5) the City wanted the Court to know that it intended to go forward with and complete the Tax Sale of a number of the properties that had been bid on that morning either by the City or by third-party buyers; (6) the City believed that the properties in question were still legally owned by Wik and others, because no deeds to the Debtor had been recorded in the Monroe County Clerk's Office; (7) by completing the Tax Sale under these circumstances, the City was not willfully violating any automatic stay; and (8) the City would do some additional research and then bring an appropriate formal application before the Court to confirm the completed Tax Sales.

At the telephonic conference, the attorney for the Debtor indicated that: (1) the Debtor was the legal owner of these properties as a result of the execution and delivery of the Quit Claim Deeds to the Debtor on October 5, 2005 or October 6, 2005 by third-party grantors, Wik or trusts that Wik controlled, since the recording of a deed was not required to convey ownership of real property under New York State Law; (2) Wik had a business plan for the Debtor, which included financing he had lined up that would enable the Debtor to rehabilitate the properties; (3) although the Debtor did not have a written loan commitment, the proposed financing under discussion could be for as much as one million

**Page 3**

dollars, with an initial $150,000.00 draw to rehabilitate five of the properties, pay the real estate taxes due on those five properties, and, with the proceeds of the sale or cash flow from the operation of those properties and additional loan draws, the Debtor could rehabilitate additional properties and pay any unpaid real estate taxes due on them; and (4) once a written loan commitment was finalized and received, the Debtor would file the necessary motion for the Court to approve the financing.

As confirmed later by a January 19, 2006 submission (the "Submission"),[1] the City completed its October 7, 2005 Tax Sale of thirty-one (31) of the forty-two (42) properties (the "Foreclosed Properties"), transferring title to them either to the City or to third-party buyers who had bid at the Tax Sale. The total outstanding taxes due on the Foreclosed Properties at the time of the Tax Sale were $150,902.74.

On November 9, 2005, the City filed a motion (the "Dismissal/Stay Annulment Motion"), which requested that the Court enter an order: (1) dismissing the Debtor's Chapter 11 case under Section 1112(b) for cause, based upon a finding that there had been a bad faith filing; and (2) under Section 362(d), annulling any automatic stay that may have gone into effect with the filing of the Debtor's petition as to the Foreclosed Properties.

---

[1] A copy of the Submission is attached to this Decision & Order.

**BK. 05-25705**

In its Dismissal/Stay Annulment Motion and subsequent pleadings and submissions, the City asserted that: (1) at the time of the filing of its petition, the Debtor was not a registered New York Corporation and was not otherwise authorized to do business in New York State; (2) although originally incorporated in Nevada, on May 1, 2005 it was dissolved by the State of Nevada and its authorization to do business was terminated for failure to comply with various requirements under Nevada law; (3) the Debtor did not file its Chapter 11 petition in furtherance of the winding up of its affairs, so, as a dissolved corporation, it did not have any authority to file a Chapter 11 petition and the Court obtained no jurisdiction upon the filing of the petition; (4) the redemption period for the Foreclosed Properties expired on August 17, 2005, so that under New York Law, none of the prior owners of those Properties had any authority to deed them to the Debtor on October 5, 2005 or October 6, 2005; and (5) when it filed its petition, the Debtor was a dissolved Nevada corporation that was not winding up its business affairs through a Chapter 11 case, but instead was attempting to maintain control over various parcels of real estate that were included in the Tax Sale, thus using Chapter 11 as a sword rather than as a shield.

On December 9, 2005, in response to the Dismissal/Stay Annulment Motion, the Debtor filed a motion (the "Contempt

**Page 5**

Motion"), which requested that the Court enter an order: (1) holding the City in contempt for its violation of the automatic stay in completing its Tax Sale of the Foreclosed Properties, which were property of the estate at that time; (2) requiring the City to deed the Foreclosed Properties back to the Debtor; (3) requiring the City to pay the Debtor the amount of any post-petition rents it or any third-party collected from tenants of the Foreclosed Properties; (4) requiring the City to pay the Debtor its actual damages for materials, tools and other tangible personal property of the Debtor, alleged by the Debtor to have been taken, used or destroyed by the third-party buyers of the Foreclosed Properties, or others while the Properties were under the City's control; and (5) requiring the City to pay other damages, including reasonable attorneys' fees.

On December 15, 2005, the City filed a response to the Contempt Motion which alleged: (1) that the Debtor was not a proper corporate entity eligible to file a Chapter 11 petition, because it had been dissolved; (2) that the Debtor's filing was a bad faith filing, the purpose of which was to thwart the Tax Sale on properties it had only acquired, if it did legally, on October 5, 2005 or October 6, 2005, one or two days before the Sale; and (3) various defenses to the Debtor's allegations of damages.

**Page 6**

## DISCUSSION

### I. Summary of Decision

After conducting a January 6, 2006 Evidentiary Hearing on the Dismissal/Stay Annulment and Contempt Motions, reading all of the pleadings and submissions of the Debtor and the City, including the Exhibits admitted at the Hearing, listening to the testimony of Wik, observing him during his testimony and forming an opinion as to credibility, the Court finds that: (1) the filing by the dissolved corporate Debtor of a petition on October 6, 2005 to initiate a Chapter 11 case was both an improper and a bad faith filing, so that it will be dismissed for cause under Section 1112(b); (2) to the extent that an automatic stay went into effect pursuant to Section 362(a) on October 6, 2005, by reason of the filing of the Debtor's petition, there is sufficient cause for the Court to annul that stay under Section 362(d)(1) retroactively to the date of the filing of the petition with respect to the actions of the City to continue and complete its Tax Sale of the Foreclosed Properties; (3) by reason of the bad faith filing and cause to annul the automatic stay retroactive to October 6, 2005, the Debtor's Contempt Motion will be in all respects denied; and (4) there is cause for the Court to enter an In Rem order regarding any future filings by any entity claiming to have an ownership interest

**BK. 05-25705**

in any of the properties owned by the Debtor on which there are unpaid City or Monroe County real estate taxes.

**II. Dismissal for Bad Faith Filing**

The Court finds that the filing of a petition by the Debtor on October 6, 2005 to initiate a Chapter 11 case was an improper and a bad faith filing for the following reasons:

1. The Debtor was dissolved by the State of Nevada and was not a corporation in good standing on October 6, 2005, and the filing of a Chapter 11 case was not an act in furtherance of the winding up of its affairs. By Wik's own admissions, the Chapter 11 case was filed in order to stop the Tax Sale and buy time to raise capital or get financing to rehabilitate the distressed properties. Furthermore, the Debtor acquired most or a substantial number of the properties in question after May 1, 2005, when it had been dissolved by the State of Nevada where it was incorporated. Clearly these acquisitions were not actions intended to wind up the Debtor's corporate affairs.[2] Therefore, the Debtor was not entitled to cure its improper filing by taking steps to reinstate in Nevada, in

---

[2] In fact, among several factors used in a totality of circumstances test to indicate a bad faith filing, Courts have identified a so-called "new debtor syndrome," which describes when a debtor is created or property is transferred solely for the purpose of filing a bankruptcy case. **See** 7 Colliers on Bankruptcy § 1112.07(2) at 1112-67 (15th Ed. 2006) citing *Trident Associates Ltd. Partnership v. Metropolitan Life Ins. Co.*, 52 F.3d 127 (6th Cir. 1995); *Little Creek Dev. Co. v. Commonwealth Mortgage Corp.,* 779 F.2d 1068 (5th Cir. 1986).

**Page 8**

**BK. 05-25705**

accordance with the Decision of the Second Circuit Court of Appeals in *In re C-TC 9th Avenue Partnership v. Norton Company*, 113 F.3d 1304 (1997);

2. The Debtor's Schedules, when finally filed, showed that it had no cash or working capital on the date of the filing of its petition;

3. On the date of the filing of its petition, the Debtor did not have a written, or even firm oral, loan commitment for the financing that would have been necessary to enable it to rehabilitate its properties under its own speculative business plan.  Wik may have been having discussions with various prospective lenders, but the reality is that on the date of the filing of the Debtor's petition there was no financing that would have provided the Debtor with the necessary funds to rehabilitate, in whole or in part, the Foreclosed Properties, or to pay administrative expenses in connection with a Chapter 11 case;

4. The Debtor produced no evidence that Wik, who directly or indirectly was in control of a number of the Foreclosed Properties prior to September 30, 2005, paid any of the real estate taxes due to the City or the County of Monroe on the properties, or made any attempt to make arrangements with

those taxing authorities to pay any back or then presently due real estate taxes;

5. On the date of the filing of its petition, the Debtor's business plan, without any working capital and without a written commitment for financing, in this Court's opinion, was pure speculation, and did not warrant the abusive filing of a Chapter 11 case to stop the City's valid and legitimate Tax Sale scheduled for the next day;

6. Chapter 11 of the Bankruptcy Code is not an economic development program. In the case of a business Chapter 11, its purpose is to allow an existing business to be reorganized and rehabilitated. In this case, Wik, the alter-ego of the Debtor, had no existing business on October 6, 2005 that could be reorganized or rehabilitated in Chapter 11. All the Debtor owned was distressed real estate that had unpaid real estate taxes due against them and had not been viable investments for their prior owners. Any business could only come into existence if Wik was somehow able to use the Bankruptcy Code as a sword rather than as a shield to stop the legitimate Tax Sale in the hopes that he could at some point in the future raise capital or obtain financing in amounts sufficient to rehabilitate enough of the distressed and unprofitable properties to produce a rental stream or sales that might

    enable him to pay the back real estate taxes on the properties and support their operations going forward; a pipedream in this Court's view; and

7. Wik has proved himself to this Court, as the result of his prior Chapter 13 cases and by his testimony at the Evidentiary Hearing, not to have the ability to operate a successful business of rehabilitating and managing multiple distressed City properties on the scale proposed in his speculative business plans.  He might be good at doing the physical work to rehabilitate distressed inner-city properties on a small scale, one or two properties at a time, but as far as business acumen in this area, the ability to rehabilitate and manage forty plus distressed City properties, obtain the required capital or financing, pay obligations on time and meet deadlines, he is definitely not up to the task.  A Chapter 11 with Wik in control, even with competent counsel, based upon this Court's experience in his pending Chapter 13 case, would be an administrative nightmare for the Court, the United States Trustee's Office and the Clerk's Office.  It would be one problem, hearing and dispute after another.

**BK. 05-25705**

**III. <u>Annulment of the Automatic Stay</u>**

This Court in its prior Decisions & Orders in *In re Harris (Clay and Lori)* 192 B.R. 334 (Bankr. W.D.N.Y. 1996), and *In re Ellinwood*, 206 B.R. 300 (Bankr. W.D.N.Y. 1997), established a procedure for mortgage holders and real property taxing authorities in appropriate cases to deal with serial and/or abusive filers who were using the Bankruptcy Code in an attempt to stop legitimate mortgage foreclosure proceedings or In Rem tax foreclosure proceedings, not intending or clearly not able to use bankruptcy as a means to cure or repay any delinquent mortgage or real estate tax debt. In those Decisions, the Court indicated that it would be available to affected mortgage holders and municipalities so that they could apply for emergency Section 362(f) relief from the automatic stay when such abusive filers filed petitions immediately before a scheduled sale. In appropriate cases, the Court allows the mortgage holder or municipality to go forward with its foreclosure sale, subject to it then applying to the Court to have any sale confirmed, so the debtor would have the opportunity to demonstrate that it had filed bankruptcy in good faith to pay its delinquent mortgage or real estate tax obligations, and that it had the ability to do so within the requirements of the Bankruptcy Code for the confirmation of any Chapter 11 or Chapter 13 plan.

**BK. 05-25705**

Although the City Attorney in the telephonic conference on October 7, 2005, did not formally request that specific relief and ask to the Court enter an interim order to that effect, the Court considered that telephonic conference to be the City's request for that Section 362(f) relief, and it understood that the City was going forward to complete all or some of the Tax Sales, risking that the Court might not confirm the sales, in which case it would be required to unwind the sales, even sales to third-party buyers.

It is clear to this Court that the Debtor strategically filed its petition one day before the Tax Sale in order to insure that the City would not have time to gather all of the relevant facts and circumstances and present them to the Court in the form of a request for a dismissal of the case or the termination of the automatic stay before the Tax Sale on October 7, 2005. It did this knowing that, unlike a mortgage holder who can simply reschedule a foreclosure sale and complete it in New York within approximately one month, the City only conducts tax foreclosure sales once or twice a year. As a result, Wik undoubtedly believed that by filing he might be able to buy himself several months possession of these real estate tax delinquent properties, even if the case was dismissed in its early stages. This timing of the execution and delivery of the Quit Claim Deeds and the filing of the Chapter 11 petition is clear evidence of the bad faith of Wik and the Debtor.

**Page 13**

**BK. 05-25705**

Based upon the foregoing and everything set forth in this Decision & Order, there is more than sufficient grounds, in this Court's opinion and its discretion, to annul any automatic stay that may have gone into effect on October 6, 2005 under Section 362(a) with the filing of the Debtor's petition, effective as of the filing of the petition on October 6, 2005, as it relates to the Foreclosed Properties and any and all actions of the City in connection with completing its Tax Sale on those Properties.

**IV. In Rem Relief**

On the attached Submission are additional properties where there were unpaid real estate taxes at the time of the filing of the petition (the "Added Properties"). The City did not complete its Tax Sale of the Added Properties on or after October 7, 2005. Should any entity, the Debtor, Wik or any other entity claiming to have an ownership interest in any of those Added Properties, file any petition with this Court before all of the unpaid real estate taxes due on those properties as of October 6, 2005 are paid in full with interest and penalties, no automatic stay shall go into effect with respect to those properties or the actions of the City of Rochester or the County of Monroe to complete any In Rem tax foreclosure proceedings against those properties in connection with such unpaid taxes.

**BK. 05-25705**

**CONCLUSION**

1. The Debtor's Chapter 11 case is dismissed pursuant to Section 1112(b) for cause;

2. Any automatic stay that may have gone into effect with the filing of the Debtor's petition on October 6, 2005 under Section 362(a) is annulled for cause, pursuant to Section 362(d)(1), as to the City's actions to complete the Tax Sale on the Foreclosed Properties, such annulment to relate back to and be effective as of October 6, 2005, the date of the filing of the petition;

3. Should any entity file a bankruptcy petition in this Court at a time when it is the alleged owner or has any ownership interest in any of the Added Properties, no automatic stay shall go into effect as to the actions of the City or the County of Monroe to complete any pending In Rem tax foreclosure proceeding in connection with those Properties for the unpaid real estate taxes due, including conducting a Tax Sale; and

4. The Debtor's Contempt Motion is in all respects denied.

**IT IS SO ORDERED.**

                                                    /s/
                                    **HON. JOHN C. NINFO, II**
                                    **CHIEF U.S. BANKRUPTCY JUDGE**

**Dated: March 16, 2006**

Page 15

BK. 05-25705

| Property | Foreclosure Status | Taxes Due |
|---|---|---|
| 225 North Union Street | Not Foreclosed | $4,782.36 |
| 1244 East Main Street | Not Foreclosed | $3,878.66 |
| 1084-1086 Norton Street | Foreclosed-sold to C. Cataldo | $2,013.91 |
| 183 First Street | Foreclosed-transferred to City | $1,964.50 |
| 699 North Goodman Street | Foreclosed-transferred to City | $2,901.53 |
| 140 Bay Street | Foreclosed-transferred to City | $2,622.67 |
| 96 Ontario Street | Foreclosed-transferred to City | $127.96 |
| 5 Lang Street | Foreclosed-transferred to City | $2,115.80 |
| 115 Berlin Street | Foreclosed-sold to L. Strickland | $4,529.76 |
| 47 Ripley Street | Foreclosed-sold to P. Adell | $11,684.66 |
| 454 Frost Avenue | Foreclosed-transferred to City | $3,257.22 |
| 206-210 Parsells Avenue | Foreclosed-transferred to City | $8,810.43 |
| 673 Bay Street (not 637) | Foreclosed-transferred to City | $783.00 |
| 1496 East Main Street | Not Foreclosed | $1,073.61 |
| 1604 East Main Street | Foreclosed-transferred to City | $8,295.73 |
| 781 Portland Avenue | Foreclosed-transferred to Chwesik et al | $4,733.71 |
| 107-109 Harris Street | Foreclosed-transferred to City | $1,388.89 |
| 432-434 Webster Avenue | Foreclosed-transferred to City | $7,916.12 |
| 108 Fairbanks Street | Not Foreclosed | $1,991.99 |
| 15 Magnolia Street | Foreclosed-transferred to City | $435.00 |
| 221-223 Fulton Avenue | Foreclosed-transferred to City | $8,462.00 |
| 170 North Union Street | Not Foreclosed | $502.00 |
| 255 North Union Street | Not Foreclosed | 4,782.36 |
| 305 First Street | Foreclosed-transferred to City | $510.35 |
| 187-189 Leighton Avenue | Foreclosed-transferred to City | $6,693.64 |
| 19 Englert Street | Foreclosed-transferred to City | $4,693.57 |
| 96 Violetta Street | Foreclosed-transferred to City | $5,017.17 |
| 51 Federal Street | Foreclosed-sold to KO Properties | $17,757.97 |
| 34 Helena Street | Not Foreclosure | $3,002.77 |
| 325 North Union Street | Foreclosed-transferred to City | $8,823.08 |
| 122 Wilkins Street | Not Foreclosed | $3,907.54 |
| 81 Clifford Avenue | Foreclosed-transferred to City | $2,662.01 |
| 241 Durnan Street | Foreclosed-transferred to City | $3,850.28 |
| 305 North Union Street | Not Foreclosed | $4,564.40 |
| 577 Bay Street | Foreclosed-sold to S. McCullough | $6,498.65 |
| 352 Fourth Street | Foreclosed-transferred to City | $2,142.02 |
| 15 Rosewood Terrace | Foreclosed-transferred to I.Dubiletskiy | $9,155.15 |
| 29 Woodward Street | Foreclosed-will be transferred to City | $7,012.84 |
| 23 Geneva Street | Foreclosed-transferred to City | $1,599.95 |
| 665 North Goodman Street | Foreclosed-transferred to City | $2,443.17 |
| 179 North Union Street | Not Foreclosed | $4,454.19 |
EEO Employer/Handicapped


BK. 05-25705

The Following properties are listed twice - foreclosure status is noted above
1084-1086 Norton Street
183 First Street
140 Bay Street
140 Bay Street
96 Ontario Street
5 Lang Street
115 Berlin Street
206-210 Parsells Avenue
673 Bay Street

EEO Employer/Handicapped


Page 17